## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND; )
and CHARLES A. WHOBREY, as Trustee, )
                      )
          *Plaintiffs*, )
    v. )
                       )     Case No. _____ (  )
LAGUNA DAIRY, S. DE R.L. DE C.V., a Mexican )
corporation; LALA BRANDED PRODUCTS, )
LLC, a Texas limited liability company; GILSA )
REAL ESTATE CO., LLC, a Nebraska limited )
liability company; FARMLAND DAIRIES LLC, )
a Delaware limited liability company; PROMISED )
LAND DAIRY, LLC, a Delaware limited liability )
company; SINTON DAIRY FOODS COMPANY )
L.L.C., a Colorado limited liability company; and )
NEW LAGUNA, LLC, a Delaware limited liability )
company, )
                      )
         *Defendants*. )

## COMPLAINT

Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund and Charles A. Whobrey, one of its present trustees, for a cause of action against Defendants allege as follows:

## SUBJECT MATTER JURISDICTION AND VENUE

1.    This action is brought and maintained in accordance with the provisions of Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001 *et seq*., and is a suit for collection of withdrawal liability, interest and penalties incurred by an employer as a result of a withdrawal from a multiemployer pension plan.

2.    This Court has jurisdiction over this action under 29 U.S.C. §§ 1132(e), 1132(f) and 1451(c).

3.      Venue lies in this Court under 29 U.S.C. §§ 1132(e)(2) and 1451(d) because multiple Defendants reside in this District. Specifically, Farmland Dairies LLC, Promised Land Dairy, LLC, and New Laguna, LLC are all organized under the laws of Delaware.

## PARTIES

4.      Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3).

5.      Plaintiff Charles A. Whobrey is a present trustee and fiduciary of Central States within the meaning of 29 U.S.C. § 1002(21)(A), and he and his fellow trustees are the plan sponsor of Central States within the meaning of 29 U.S.C. § 1301(a)(10). The Trustees administer Central States at 8647 West Higgins Road in Chicago, Illinois.

6.      Pursuant to 29 U.S.C. §§ 1132(a)(3) and 1451(a)(1), the Trustees, by and through their designated trustee Charles A. Whobrey, are authorized to bring this action on behalf of Central States, its participants, and its beneficiaries for the purpose of collecting withdrawal liability.

7.      Defendant Laguna Dairy, S. de R.L. de C.V. f/k/a Laguna Dairy, S.A. de C.V. ("Laguna") is a corporation organized under the laws of Mexico.

8.      Defendant Lala Branded Products, LLC f/k/a Lala Branded Products, Inc. ("Lala Branded Products") is a limited liability company organized under the laws of Texas.

9.      Defendant Gilsa Real Estate Co., LLC ("Gilsa Real Estate") is a limited liability company organized under the laws of Nebraska.

10.     Defendant Farmland Dairies LLC ("Farmland Dairies") is a limited liability company organized under the laws of Delaware.

11.     Defendant Promised Land Dairy, LLC f/k/a PL Newco, LLC ("Promised Land Dairy") is a limited liability company organized under the laws of Delaware.

12.     Defendant Sinton Dairy Foods Company L.L.C. ("Sinton Dairy") is a limited liability company organized under the laws of Colorado.

13.     Defendant New Laguna, LLC ("New Laguna") is a limited liability company organized under the laws of Delaware.

## BACKGROUND

### I.     The ownership of Defendants, Borden Dairy Ohio, and Borden Transport Ohio.

14.     On November 9, 2014, Defendant Laguna directly or indirectly owned at least 80% of the total combined voting power of all classes of outstanding stock entitled to vote or at least 80% of the total value of outstanding shares of all classes of stock of non-party Borden Dairy Company (a corporation).

15.     On November 9, 2014, non-party Borden Dairy Company directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of Defendant Lala Branded Products.

16.     On November 9, 2014, Defendant Lala Branded Products directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of Defendant Gilsa Real Estate.

17.     On November 9, 2014, non-party Borden Dairy Company directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of non-party National Dairy, LLC.

18.     On November 9, 2014, non-party National Dairy, LLC directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of Defendant Farmland Dairies.

19.     On November 9, 2014, non-party National Dairy, LLC directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of Defendant Promised Land Dairy.

20.     On November 9, 2014, non-party National Dairy, LLC directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of Defendant Sinton Dairy.

21.     On November 9, 2014, non-party National Dairy, LLC directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of non-party Borden Dairy Company of Ohio, LLC ("Borden Dairy Ohio").

22.     On November 9, 2014, non-party Borden Dairy Ohio directly or indirectly owned at least 80% of the total membership interest or at least 80% of the profits interest or capital interest of non-party Borden Transport Company of Ohio, LLC ("Borden Transport Ohio").

II.     **Defendants' operations.**

A.     **Laguna.**

23.     On or about July 1, 2013, Defendant Laguna was registered as a corporation in the Mercantile Registry in the city of Gomez Palacio in the Mexican state of Durango.

24.     From on or about July 1, 2013 through present, Laguna has been a formally organized corporation.

25.     On or before November 7, 2014, in relation to a loan that Laguna and/or an affiliated entity received, Laguna provided a security interest in some or all of its assets to JPMorgan Chase Bank, N.A.

26.     Laguna has also entered into other agreements, including but not limited to a contract in which Laguna sold assets to another company in 2016 and a 2017 Reorganization and Subscription Agreement, which is discussed in further detail below.

**B.      Lala Branded Products.**

27.     On December 28, 2010, Lala Foods, Inc., a preexisting Texas corporation, filed documents with the Texas Secretary of State in which it changed its name to Lala Branded Products, Inc.

28.     Subsequently, in or around July 2016, Lala Branded Products, Inc. filed articles of conversion with the Texas Secretary of State in which it changed its name to Lala Branded Products, LLC.

29.     From December 28, 2010 through present, Defendant Lala Branded Products has been a formally organized entity organized under Texas law.

30.     Upon information and belief, from January 2009 at the latest through at least December 2015, Lala Branded Products manufactured fluid milk and yogurt for distribution and/or sale.

31.     In addition, in or around December 2010, Lala Branded Products applied for and received a Federal Employer Identification Number ("FEIN") from the United States government.

32.     On or about March 1, 2011, Lala Branded Products filed with the North Carolina Secretary of State an application "for a Certificate of Authority to transact business in the State of North Carolina."

33.     On or about March 9, 2011, the application referred to in the previous paragraph was granted.

34.     Further, in each year from 2012 through 2016, Lala Branded Products filed annual reports with the North Carolina Secretary of State.

35.     In each of the annual reports that it filed with the North Carolina Secretary of State from 2012 through 2016, Lala Branded Products stated that the "Nature of [its] Business" was "Fluid Milk & Yogurt Manufacturing."

36.     On or about March 11, 2011, Lala Branded Products filed a statement with the California Secretary of State in which it stated that it was "presently qualified for the transaction of intrastate business in the State of California."

37.     On or about May 11, 2011, Lala Branded Products filed with the Indiana Secretary of State an application for a "certificate of authority . . . to transact business in the State of Indiana."

38.     On or about May 16, 2011, the application referred to in the previous paragraph was granted.

39.     During the period of May 2013 through May 2015, Lala Branded Products filed "Business Entity Reports" with the Indiana Secretary of State in which Lala Branded Products stated that it was a "for-profit foreign corporation."

40.     On or about December 17, 2013, Lala Branded Products filed with the Virginia Secretary of State an "Application for a Certificate of Authority to Transact Business in Virginia as a Foreign Corporation."

41.     On December 19, 2013, the application referred to in the previous paragraph was granted.

42.     On or about December 18, 2013, Lala Branded Products filed with the Florida Secretary of State an application "for authorization to transact business in Florida," in which it stated that Lala Branded Products' operations included the "manufacture and sale of milk products."

43.     On or about December 18, 2013, the application referred to in the previous paragraph was granted.

44.     In addition, in July 2014 and again in 2015 and 2016, Lala Branded Products filed annual reports with the Florida Secretary of State in which it identified a "Principal Place of Business."

### C.     Gilsa Real Estate.

45.     On February 11, 2008, Defendant Gilsa Real Estate filed articles of organization with the Nebraska Secretary of State.

46.     From February 11, 2008 through present, Gilsa Real Estate has been a formally organized corporation organized under Nebraska law.

47.     In addition, in or around February 2008, Gilsa Real Estate applied for and received an FEIN from the United States government.

48.     From April 2010 through at least December 2015, Gilsa Real Estate owned one or more parcels of real estate in Nebraska, which Defendant Lala Branded Products used in its operations.

### D.     Farmland Dairies.

49.     On June 21, 2001, Defendant Farmland Dairies filed a certificate of formation with the Delaware Secretary of State.

50.     From June 21, 2001 through present, Farmland Dairies has been a formally organized limited liability company organized under Delaware law.

51.     From July 2001 through December 2013 at the earliest, Farmland Dairies manufactured and/or sold dairy products.

52.     In addition, in or around June 2001, Farmland Dairies applied for and received an FEIN from the United States government.

53.     Also, in or around August 2001, Farmland Dairies filed with the New York Secretary of State an application to conduct business in New York under N.Y. Bus. Corp. Law § 1304, which application was granted.

**E.     Promised Land Dairy.**

54.     On June 25, 2009, PL Newco, LLC, an existing Delaware company, filed documents with the Delaware Secretary of State in which it changed its name to Promised Land Dairy, LLC.

55.     From June 25, 2009 through present, Defendant Promised Land Dairy has been a formally organized limited liability company organized under Delaware law.

56.     In addition, in 2009, Promised Land Dairy applied for and received an FEIN from the United States government.

57.     In 2009, Promised Land Dairy also applied for and received an interstate milk shipper's permit from the U.S. Food and Drug Administration.

58.     From January 2010 at the latest through present, Promised Land Dairy has manufactured dairy products for distribution and/or sale and shipped such products.

**F.     Sinton Dairy.**

59.     On November 27, 1995, Defendant Sinton Dairy filed articles of organization with the Colorado Secretary of State.

60.     From November 27, 1995 through present, Sinton Dairy has been a formally organized limited liability company organized under Colorado law.

61.     From January 1996 through present, Sinton Dairy has manufactured—and distributed and/or sold—food products, including dairy products.

62.     Upon information and belief, in or before 1996, Sinton Dairy applied for and received a permit from the United States Department of Transportation to transport refrigerated products, which permit is still active.

63.     In addition, in or around November 2005, Sinton Dairy applied for and received an FEIN from the United States government.

64.     On or about June 10, 1996, Sinton Dairy filed with the Wyoming Secretary of State an application "for a Certificate of Authority to transact business in the State of Wyoming," in which Sinton Dairy stated that "the type of business that the company will be conducting" was "procuring, processing, manufacturing, marketing and distributing for sale dairy and food products of all kinds and nature."

65.     On or about June 24, 1996, the application referred to in the previous paragraph was granted.

66.     During each year from 1997 through 2016, Sinton Dairy filed annual reports with the Wyoming Secretary of State.

III.     **The withdrawal from Central States and the Central States Withdrawal Liability.**

67.     In light of the facts set forth above, including those set forth in paragraphs 14 through 22, on November 9, 2014, Borden Dairy Ohio, Borden Transport Ohio, and Defendants Laguna, Lala Branded Products, Gilsa Real Estate, Farmland Dairies, Promised Land Dairy, and Sinton Dairy were all "under common control" within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder.

68.     Further, on November 9, 2014, Borden Dairy Ohio, Borden Transport Ohio, and all trades or businesses under common control with those two entities on that date—including but not limited to Defendants Laguna, Lala Branded Products, Gilsa Real Estate, Farmland Dairies, Promised Land Dairy, and Sinton Dairy, which were trades or businesses as shown in paragraphs 23 through 66 above—were a group of trades or businesses under common control (the "Borden Controlled Group") and therefore constituted a single employer within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder.

69.     The Borden Controlled Group is the "employer" for purposes of the determination and assessment of withdrawal liability under MPPAA.

70.     Non-parties Borden Dairy Ohio and Borden Transport Ohio were previously bound by collective bargaining agreements with certain local unions affiliated with the International Brotherhood of Teamsters under which Borden Dairy Ohio and Borden Transport Ohio were required to contribute to Central States on behalf of certain of their employees.

71.     Central States determined that on or about November 9, 2014, the Borden Controlled Group permanently ceased to have an obligation to contribute to Central States, thereby effecting a "complete withdrawal" from Central States within the meaning of 29 U.S.C. § 1383.

72.     Under MPPAA, the withdrawing entities and all trades or businesses under common control with them on the withdrawal date are jointly and severally liable for the withdrawal liability. 29 U.S.C. § 1301(b)(1); *see also, e.g., Flying Tiger Line v. Teamsters Pension Tr. Fund of Phila.*, 830 F.2d 1241, 1244 (3d Cir. 1987); *Cent. States, Se. & Sw. Pension Fund v. Personnel, Inc*., 974 F.2d 789, 793 (7th Cir. 1992). Accordingly, as a result of the complete withdrawal, the Borden Controlled Group—including but not limited to Defendants Laguna, Lala Branded Products, Gilsa Real Estate, Farmland Dairies, Promised Land Dairy, and Sinton Dairy— incurred joint and several withdrawal liability to Central States as determined under 29 U.S.C. § 1381(b).

73.     On or about January 12, 2015, the Borden Controlled Group, through Borden Dairy Ohio, received a notice and demand for payment of withdrawal liability issued by Central States in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1). In the notice and demand, Central States notified the Borden Controlled Group that it was required to discharge its liability in a lump sum of $41,634,085.54, or in 240 monthly payments of $199,647.14, with the first installment due on or before February 1, 2015, and a final installment due on or before January 1, 2035. Subsequently, the assessment was revised so that the Borden Controlled Group was required to discharge its liability in a lump sum of $41,634,085.54, or in 240 monthly payments of $183,225.00, with the first installment due on or before February 1, 2015, and a final installment due on or before January 1, 2035 (the "Central States Withdrawal Liability").

74.     From January 30, 2015 through December 31, 2019, the Borden Controlled Group made interim payments towards the Central States Withdrawal Liability in the total amount of $10,993,500.00. Also, as part of the below-discussed Bankruptcy, on June 14, 2022, the Fund

received a distribution of $128,576.22 on account of a claim it filed for the Central States Withdrawal Liability.

75.     In addition, during the period of July 2020 through August 2020, the members of the Borden Controlled Group who were not debtors in the below-discussed Bankruptcy—including Defendants Laguna, Lala Branded Products, Gilsa Real Estate, Farmland Dairies, Promised Land Dairy, and Sinton Dairy—received notices from Central States pursuant to 29 U.S.C. § 1399(c)(5)(A), advising them that the withdrawal liability payments were past due and forewarning them of the consequences of failing to pay such withdrawal liability (the "Past Due Notices"). Specifically, Past Due Notices were received by the following Defendants on or about the following dates: Promised Land Dairy on or about July 17, 2020; Sinton Dairy on or about July 17, 2020; Lala Branded Products on or about July 21, 2020; Gilsa Real Estate on or about July 21, 2020; Farmland Dairies on or about August 10, 2020; and Laguna on or about August 28, 2020.

76.     Despite the Past Due Notices, no payments have been made towards the Central States Withdrawal Liability other than those referenced in paragraph 74 above. More specifically, during January 1, 2020 through present, the Borden Controlled Group has not made any payments towards the Central States Withdrawal Liability and the only payment that Central States has received towards that withdrawal liability is the $128,576.22 distribution in the Bankruptcy referred to in paragraph 74 above.

77.     Of the payments referenced in paragraph 74 above, Central States applied a total of $2,314,091.54 to the principal amount of the Central States Withdrawal Liability and applied the remainder to billing charges and amortization. As a result, the remaining principal balance on the Central States Withdrawal Liability is $39,319,944.00 ($41,634,085.54 minus $2,314,091.54).

78.     Although the Central States Withdrawal Liability is the largest withdrawal liability assessment owed by the Borden Controlled Group, the Borden Controlled Group also effected a withdrawal from the Retail, Wholesale and Department Store International Union and Industry Pension Fund (the "RWDSU Fund") in or around September 2015. As a result, the Borden Controlled Group incurred withdrawal liability to the RWDSU Fund in the amount of approximately $391,040.00 (the "RWDSU Withdrawal Liability").

IV.     **The 2017 RSA and the formation of Laguna's alter ego, New Laguna.**

79.     From before November 9, 2014 through on or about July 4, 2017, Laguna was the sole owner of non-party Borden Dairy Company.

80.     In or before December 2016, Laguna and a Delaware company called Acon Investments, LLC ("ACON") began discussions regarding ACON potentially acquiring Borden Dairy Company equity from Laguna. (20-ap-50450, D. Del. Bankr., Dkt No. 7 at p. 18, ¶ 46; 20-ap-50450, D. Del. Bankr., Dkt No. 14 at p. 7, ¶ 46.) As part of those discussions, "ACON and Laguna determined that, in lieu of a purchase price reduction to account for the outstanding" Central States Withdrawal Liability and RWDSU Withdrawal Liability, "Laguna would leave cash in Borden [Dairy Company] to cover" those withdrawal liabilities. (*Id.*)

81.     As a result of those discussions, on or about July 5, 2017, Laguna, ACON, and others entered into a Reorganization and Subscription Agreement (the "2017 RSA"). The 2017 RSA is attached hereto as Exhibit A.

82.     As part of the 2017 RSA, Laguna created a wholly owned subsidiary—Borden Dairy Holdings, LLC ("Borden Holdings")—and then transferred all ownership interests in Borden Dairy Company to Borden Holdings.

83.     Also, as part the 2017 RSA, Laguna received consideration in the form of a distribution from Borden Dairy Company. Laguna then transferred a portion of that consideration to Defendant New Laguna, which was formed under Delaware law in March 2017 and has been at all times since its formation a wholly owned subsidiary of Laguna. New Laguna then purchased from Laguna 51% of the shares in Borden Holdings in exchange for the portion of the consideration that it had received from Laguna. (Ex. A (2017 RSA), § 2.01(d).)

84.     Laguna then sold 49% of the shares in Borden Holdings to a Delaware entity called ACON Dairy Investors, L.L.C., a wholly owned subsidiary of ACON. (Ex. A (2017 RSA) at p. 1 (Recitals) & § 2.01(d).)

85.     Through the 2017 RSA, Laguna also attempted to reduce the Central States Withdrawal Liability exposure it had as a member of the Borden Controlled Group by establishing a reserve account (the "Reserve Account") to pay that liability (and the RWDSU Withdrawal Liability).

86.     More specifically, pursuant to the terms of the 2017 RSA, Laguna deposited approximately $30 million into the Reserve Account, which was a "negotiated amount" that was less than the total combined balance on the Central States Withdrawal Liability and the RWDSU Withdrawal Liability. (20-ap-50450, D. Del. Bankr., Dkt No. 7 at p. 11, ¶¶ 17-18; 20-ap-50450, D. Del. Bankr., Dkt No. 14 at p. 5, ¶¶ 17-18.)

87.     The 2017 RSA referred to the monies in the Reserve Account as the "Central States Cash," and stated that such monies were to be used to make payments toward the Central States Withdrawal Liability (and the RWDSU Withdrawal Liability). (Ex. A (2017 RSA), § 2.02(a)(i).)

88.     If after the Central States Withdrawal Liability and the RWDSU Withdrawal Liability had been discharged in full, a portion of the Central States Cash remained, any such excess cash would be paid to Laguna. (Ex. A (2017 RSA), § 2.02(b).)

89.     Thus, the purpose of the Reserve Account was to ensure that the non-Laguna members of the Borden Controlled Group would continue to make withdrawal liability payments to Central States and to the RWDSU Fund. (Case No. 20-bk-10010, D. Del. Bankr., Dkt No. 120, ¶ 8.)

90.     In other words, in the 2017 RSA "Laguna Dairy left [] funds behind in the Reserve Account for the express purpose of paying" the withdrawal liability owed by the Borden Controlled Group. (Case No. 20-bk-10010, D. Del. Bankr., Dkt No. 120, ¶ 22.)

91.     In exchange for the establishment of the Reserve Account, Laguna—and its newly created subsidiary, New Laguna—agreed to indemnify the other members of the Borden Controlled Group for the portion of the Central States Withdrawal Liability that was not paid from the Reserve Account. Specifically, the 2017 RSA provided that Laguna and New Laguna would indemnify and hold harmless Borden Dairy Company and its affiliates for any and all losses incurred or sustained by Borden Dairy Company and/or its affiliates "based upon, arising out of, with respect to or by reason of . . . any liabilities arising from the failure to pay all Central States Withdrawal Liability . . . when due." (Ex. A (2017 RSA), § 7.02(a)(vii).)

92.     Also, in the 2017 RSA, New Laguna "appoint[ed] Laguna as its attorney in fact." (Ex. A (2017 RSA), § 10.01(a).) Although Section 10.01(a) of the 2017 RSA listed specific acts that Laguna could take for New Laguna, the 2017 RSA did not state that this was an exclusive list of such acts or that the appointment of Laguna as New Laguna's attorney in fact was limited in any way. (*Id.*)

93. Upon information and belief, the appointment of Laguna as New Laguna's attorney in fact has not been revoked, and as such Laguna has been the attorney in fact for New Laguna from on or about July 5, 2017 through present.

94. In addition, Laguna and New Laguna did not deal at arm's length. For example, as part of the 2017 RSA, Laguna acquired a direct 100% ownership interest in Defendant Farmland Dairies and then transferred this ownership interest to New Laguna, even though, upon information and belief, New Laguna did not provide any consideration for that transfer of ownership interest. (Ex. A (2017 RSA), § 2.02(a)(6).)

95. Also, New Laguna was formed as a domestic Delaware company in March 2017, during the period when the 2017 RSA was being negotiated.

96. In addition, New Laguna and Laguna were represented by the same attorneys in relation to the 2017 RSA. Those same attorneys also represented both New Laguna and Laguna in the Bankruptcy (discussed below).

97. Further, under the 2017 RSA, any notices to New Laguna were to be sent not to New Laguna directly but to New Laguna "c/o Laguna Dairy, S. de R.L. de C.V." at Laguna's offices. (Ex. A (2017 RSA), § 9.02.)

98. Also, in the 2017 RSA, Laguna admitted that it was "indirectly acting through New Laguna" by having New Laguna enter into a certain escrow agreement in relation to the 2017 RSA. (Ex. A (2017 RSA), § 10.02.)

99. Even though Laguna did not enter into that escrow agreement, the escrow agreement provided that notices to New Laguna under the escrow agreement were to be sent to New Laguna "c/o Laguna Dairy, S. de R.L. de C.V." at Laguna's offices.

100.     Similarly, in an amended and restated LLC agreement entered into relating to Borden Holdings as part of the 2017 RSA, New Laguna's address was listed as New Laguna "c/o Laguna Dairy, S. de R.L. de C.V." at Laguna's offices.

101.     Upon information and belief, New Laguna has never had a mailing address separate from Laguna's address and has never had its own place of business.

102.     Further, upon information and belief, New Laguna and Laguna have at all times had many (if not all) of the same officers, directors, and managers.

103.     Based on the foregoing and upon information and belief, New Laguna was created so that Laguna could have a United States-based entity through which Laguna could perform its obligations under the 2017 RSA and hold the assets (the 51% interest in Borden Dairy Company and the 100% interest in Farmland Dairies) that Laguna was retaining/acquiring through the 2017 RSA.

## V.     The Delaware Bankruptcy and Laguna's seeking of relief therein.

104.     On January 5, 2020, Borden Transport Ohio, Borden Dairy Ohio, and sixteen other affiliates (the "Debtors"), none of which are Defendants in this case, filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (Case No. 20-bk-10010, D. Del. Bankr.). That bankruptcy action (the "Bankruptcy") was closed on May 10, 2022.

105.     Laguna actively participated in the Bankruptcy to attempt to reduce the withdrawal liability exposure it has as a member of the Borden Controlled Group.

106.     Specifically, on January 16, 2020, Laguna (through its attorneys) filed an objection to the Debtors' request in their cash collateral motion to use the Reserve Account as cash collateral to help finance Debtors' operations/the Bankruptcy (the "Laguna Cash Collateral Objection"). (20-bk-10010, D. Del. Bankr., Dkt No. 120.)

107.    In the Laguna Cash Collateral Objection, Laguna argued that it had "an interest in preventing the depletion of the Reserve Account for purposes other than what was intended— paying [] pension liabilities—because Laguna is contractually obligated under the 2017 RSA to fund any shortfall to the extent the pension withdrawal liabilities are not covered by the Reserve Account." (20-bk-10010, D. Del. Bankr., Dkt No. 120, ¶ 1.)

108.    Further, in the Laguna Cash Collateral Objection, Laguna affirmatively sought withdrawal liability-related relief from the Delaware bankruptcy court. Specifically, Laguna asked the bankruptcy court to deny the cash collateral motion to the extent the motion sought to allow Debtors to use the property in the Reserve Account for purposes other than paying the Central States Withdrawal Liability and RWDSU Withdrawal Liability without first providing adequate protection to Laguna. (20-bk-10010, D. Del. Bankr., Dkt No. 120 at p. 15.)

109.    Subsequently, certain of Debtors' lenders filed objections to Debtors' cash collateral motion in which they argued that the lenders' interest in the Reserve Account was superior to Laguna's, and that the Reserve Account could not be used as cash collateral because it secured the lenders' prepetition loans. (20-bk-10010, D. Del. Bankr., Dkt Nos. 131-132.)

110.    On January 21, 2020, Laguna filed a response to the lenders' objections, in which Laguna requested that the Delaware bankruptcy court reject the lenders' position that the Reserve Account secured the lender's prepetition loan. (20-bk-10010, D. Del. Bankr., Dkt Nos. 134-1 at p. 5.)

111.    Also, on January 22, 2020, Laguna filed an objection to a motion for adequate protection filed by one of Debtors' lenders, PNC Bank. (20-bk-10010, D. Del. Bankr., Dkt No. 158.)

112.    In the objection referenced in the previous paragraph, Laguna again requested relief from the Delaware bankruptcy court by asking the court to deny PNC's adequate protection motion to the extent that motion sought to allow a lien on the Reserve Account. (20-bk-10010, D. Del. Bankr., Dkt No. 158 at p. 4.)

113.    On January 23, 2020, Laguna (through one of its attorneys) appeared at an in-person hearing in the Delaware bankruptcy court and again objected to Debtors using the Reserve Account for purposes other than paying withdrawal liability.

114.    On February 4, 2020, PNC Bank initiated an adversary proceeding against Laguna and other entities, in which PNC sought a declaratory judgment that its interest in the Reserve Account was superior to all other interests, including Laguna's. (20-ap-50450, D. Del. Bankr., Dkt No. 1.)

115.    On March 6, 2020, Laguna filed an answer to PNC Bank's complaint in the adversary case, in which Laguna requested that the Delaware bankruptcy court dismiss the adversary proceeding and award Laguna its costs relating to that proceeding. (20-ap-50450, D. Del. Bankr., Dkt No. 3 at p. 7.)

116.    In addition, on April 24, 2020, Laguna filed an answer to a crossclaim that Borden Dairy Company filed against Laguna in relation to the Reserve Account and, in that answer to that crossclaim, requested that the Delaware bankruptcy court dismiss that crossclaim and award Laguna its costs in defending against the crossclaim. (20-ap-50450, D. Del. Bankr., Dkt No. 14 at p. 12.)

117.    Subsequently, Laguna negotiated a settlement agreement in the Delaware bankruptcy court, through which Laguna paid monies in exchange for a release of its withdrawal liability indemnification obligations under the 2017 RSA.

118.    Specifically, in February 2020, Laguna, through an officer and one of its attorneys, attended a mediation in Delaware with the Debtors and the other parties in interest in the Bankruptcy to attempt to settle, among other things, Laguna's withdrawal liability indemnification obligations under the 2017 RSA. The mediation was overseen by a Judge from the Delaware bankruptcy court.

119.    Also, in early July 2020, Laguna and Central States (through their respective attorneys) had multiple discussions via phone and email about a potential settlement of Laguna's liability to Central States for the Central States Withdrawal Liability. Those discussions did not result in a settlement.

120.    On July 14, 2020, Debtors, with the consent of Laguna, filed a motion asking the Delaware bankruptcy court to approve a settlement agreement (the "Bankruptcy Settlement Agreement") between Debtors, Laguna, and certain other parties in interest in the Bankruptcy (not including Central States). (20-bk-10010, D. Del. Bankr., Dkt No. 957.)

121.    On July 16, 2020, the Delaware bankruptcy court granted the motion and approved the Bankruptcy Settlement Agreement. (20-bk-10010, D. Del. Bankr., Dkt No. 970.)

122.    As part of the Bankruptcy Settlement Agreement, Laguna and New Laguna paid $2.5 million in cash to the Debtors' estates. (20-bk-10010, D. Del. Bankr., Dkt No. 970-1, ¶ 5.)

123.    In addition, Laguna and New Laguna also released and waived any claims relating to the Reserve Account, including any argument in the bankruptcy or the above-discussed adversary proceeding that the Debtors were required to use the Reserve Account to pay the Central States Withdrawal Liability and the RWDSU Withdrawal Liability. (20-bk-10010, D. Del. Bankr., Dkt No. 970-1, ¶ 12(b).)

124.    In exchange, the Debtors released Laguna (and New Laguna) from, among other things, Laguna and New Laguna's obligation under the 2017 RSA to indemnify the non-Laguna members of the Borden Controlled Group for the unpaid portion of the Central States Withdrawal Liability. (20-bk-10010, D. Del. Bankr., Dkt No. 970-1, ¶ 12(a).)

125.    The Settlement Agreement also provided that all "disputes concerning enforcement of this Agreement shall be determined by the United States Bankruptcy Court for the District of Delaware, or if such court no longer has jurisdiction, by State and Federal Courts sitting in Delaware, and each Party irrevocably submits to such court's jurisdiction for purposes hereof. This Agreement shall be governed by Delaware law without regard to conflicts of law principles." (20-bk-10010, D. Del. Bankr., Dkt No. 970-1, ¶ 20.)

126.    Central States was not a party to the Bankruptcy Settlement Agreement. Specifically, although Central States was a member of the committee of unsecured creditors and the committee was a party to the agreement, the agreement expressly stated that the individual members of the committee were not parties to the agreement. (20-bk-10010, D. Del. Bankr., Dkt No. 970-1, at p. 1.)

127.    In fact, the Bankruptcy Settlement Agreement specifically provided that any releases given to Laguna/New Laguna in the Bankruptcy Settlement Agreement were "inapplicable to the Committee members, in their individual capacities" and that "the individual Committee members" were not "providing a release . . . on account of any claim that any Committee members may assert in their individual capacities." (20-bk-10010, D. Del. Bankr., Dkt No. 970-1, ¶ 12(a).)

## PERSONAL JURISDICTION OVER DEFENDANTS

**I.      Personal Jurisdiction over Defendant Laguna.**

      **A.      Laguna is subject to specific personal jurisdiction in this District.**

128.    As shown in the below Claim for Relief, under 29 U.S.C. § 1301(b)(1) and the regulations promulgated thereunder, Laguna is jointly and severally liable for the Central States Withdrawal Liability because it was under common control with the withdrawing entities on the withdrawal date.

129.    Laguna is also subject to specific personal jurisdiction in this action to collect the Central States Withdrawal Liability.

130.    In this Circuit, there are three requirements for specific personal jurisdiction to be permissible under the federal constitution: (1) "the defendant must have purposefully directed . . . activities at the forum"; (2) "the litigation must arise out of or relate to at least one of those activities"; and (3) exercising jurisdiction must "comport[] with fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). All three of those requirements are met here in relation to Laguna.

131.    *First*, Laguna purposely directed activities at Delaware. For example, as discussed in paragraphs 83 and 92 through 103 above, as part of the 2017 RSA, Laguna created a wholly owned Delaware subsidiary (New Laguna), for which it acts as the attorney in fact.

132.    In addition, as shown in paragraphs 104 through 127 above, Laguna also purposely directed its activities at this District by actively participating in the Bankruptcy, including with respect to the Central States Withdrawal Liability.

133.    In fact, Laguna repeatedly requested relief from the Delaware bankruptcy court, including relief that if granted would have required the Debtors to continue to use the Reserve

Account to make payments toward the Central States Withdrawal Liability (and the RWDSU Withdrawal Liability), thereby reducing Laguna's withdrawal liability exposure, including its exposure relating to the Central States Withdrawal Liability. (See paragraphs 104 through 116 above.)

134.    Laguna also negotiated the Bankruptcy Settlement Agreement, under which Laguna received a release from its obligation under the 2017 RSA to indemnify the other members of the Borden Controlled Group from any shortfalls in payments towards the Central States Withdrawal Liability. (See paragraphs 117 through 127 above.)

135.    The Bankruptcy Settlement Agreement was negotiated with the assistance of—and approved by—the Delaware bankruptcy court, and Laguna (through an officer and one of its attorneys) attended an in-person mediation in Delaware as part of its efforts to negotiate that agreement. (See paragraphs 117 through 118 and 121 above.)

136.    Laguna also agreed that any disputes over the Bankruptcy Settlement Agreement would be governed by Delaware law and adjudicated exclusively in Delaware courts. (See paragraph 125 above.)

137.    *Second*, this action to collect the Central States Withdrawal Liability arises out of and relates to Laguna's above contacts with this District.

138.    In relation to the second requirement of "arising out of or related to," the Third Circuit has emphasized that the "animating principle behind the relatedness requirement is the notion of a tacit *quid pro quo* that makes litigation in the forum reasonably foreseeable." *O'Connor*, 496 F.3d at 322.

139.    Here, as shown in paragraphs 104 through 127 above, Laguna repeatedly interjected itself into the Bankruptcy proceedings to attempt to reduce its exposure in relation to the Central States Withdrawal Liability.

140.    Further, as a result of those efforts, Laguna gained a withdrawal liability-related benefit in the Bankruptcy. Specifically, as part of the Bankruptcy Settlement Agreement, Laguna received a release from its obligation under the 2017 RSA to indemnify the other members of the Borden Controlled Group for any shortfalls in payments towards the Central States Withdrawal Liability (and the RWDSU Withdrawal Liability).

141.    Under the *quid pro quo* concept that the Third Circuit articulated in *O'Connor*, after using this forum to gain a withdrawal liability-related benefit, Laguna should not be entitled to now claim that it is not subject to personal jurisdiction in this action to collect that very same withdrawal liability.

142.    In other words, after using this forum to gain a benefit related to the Central States Withdrawal Liability, Laguna should reasonably have foreseen being hauled into court in this District in other actions relating to that same withdrawal liability, such as this action.

143.    *Third*, for the reasons just discussed in paragraphs 137 through 142 above, exercising jurisdiction over Laguna here comports with fair play and substantial justice. *See O'Connor*, 496 F.3d at 317. As such, exercising specific personal jurisdiction over Laguna comports with the federal constitution.

144.    Further, where exercising specific personal jurisdiction over a defendant comports with the federal constitution, exercising such jurisdiction also comports with the Delaware long-arm statute, 10 Del. Stat. § 3104(c), and the due process clause of the Delaware Constitution. *Nuova D & B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986) ("section 3104(c) has been

broadly construed to confer jurisdiction to the maximum extent possible under the due process

clause" of the Fourteenth Amendment to the federal constitution); *Wyndmoor Learning Ctr. v. City*

*of Wilmington*, No. 93-cv-4217, 1994 WL 116115, at *1 (E.D. Pa. Mar. 10, 1994) ("the due process

protections of the Delaware Constitution are parallel to those of the United States Constitution"

(citing *In Re Carolyn S.S.,* 498 A.2d 1095, 1098 (Del.1984)).

145.    Accordingly, this Court has specific personal jurisdiction over Laguna.

**B.      Because New Laguna is Laguna's alter ego, Laguna is subject to general personal jurisdiction in this District.**

146.    Also, for the reasons set forth in paragraphs 83 and 92 through 103 above,

Defendants Laguna and New Laguna are alter egos.

147.    Indeed, the fact that Laguna is New Laguna's attorney in fact, by itself, shows that

the two entities are alter egos. *See, e.g.*, *Heine v. Newman, Tannenbaum, Helpern, Syracuse &*

*Hirschtritt*, 856 F. Supp. 190, 194 (S.D.N.Y. 1994).

148.    Further, even ignoring that Laguna is New Laguna's attorney in fact, the other facts

set forth in paragraphs 83 and 94 through 103 above show that the two entities are alter egos.

149.    As such, to the extent New Laguna is subject to general personal jurisdiction in this

District, Laguna is subject to general personal jurisdiction in this District as well.

150.    Here, this Court has general personal jurisdiction over New Laguna because it is

organized under the laws of Delaware.

151.    As such, the Court has general personal jurisdiction over any alter egos of New

Laguna, including Defendant Laguna.

C.      **For purposes of this case, Laguna has waived any argument that it is not subject to personal jurisdiction in this Court.**

152.    Also, where an entity seeks relief in an action, it waives personal jurisdiction challenges to subsequent actions in the same forum that bear a "logical relationship" to the relief sought. *Foster Wheeler Energy Corp. v. Metallgesellschaft AG*, No. 91-cv-214, 1993 WL 669447, at *4 (D. Del. Jan. 4, 1993) (citing *Gen. Contracting & Trading Co., LLC v. Interpole, Inc*., 940 F.2d 20, 24 (1st Cir. 1991)).

153.    Here, as shown in paragraphs 104 through 127 above, in the Bankruptcy, Laguna repeatedly sought relief from the Delaware bankruptcy court in relation to the Reserve Account and the Central States Withdrawal Liability.

154.    For example, in the Laguna Cash Collateral Objection, Laguna affirmatively requested that the Delaware bankruptcy court deny the cash collateral motion to the extent the motion sought to allow Debtors to use the property in the Reserve Account for purposes other than paying the Central States Withdrawal Liability and the RWDSU Withdrawal Liability without first providing adequate protection to Laguna. (20-bk-10010, D. Del. Bankr., Dkt No. 120 at p. 15.)

155.    Thus, Laguna has waived any right to challenge personal jurisdiction in any actions in this District that relate to the relief Laguna sought in the Bankruptcy.

156.    This action bears a strong relationship to the relief Laguna sought in the Bankruptcy. Specifically, Central States is attempting to collect the Central States Withdrawal Liability, which (along with the RWDSU Withdrawal Liability) is the debt that Laguna was seeking to reduce its exposure for through the relief it sought in the Bankruptcy.

157.    As such, Laguna has waived any right to challenge personal jurisdiction in this action.

## II.     Personal Jurisdiction over the Defendants other than Laguna.

158.     ERISA contains nationwide service of process provisions, 29 U.S.C. §§ 1132(e)(2) and 1451(d), which both provide that "process may be served . . . in any district where a defendant may be found."

159.     Where a defendant is served pursuant to a nationwide service of process provision (such as those set forth in ERISA), the service itself provides the statutory basis for personal jurisdiction. *E.g.*, *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 117 (3d Cir. 2020); *In re DBSI, Inc.*, 451 B.R. 373, 376 (Bankr. D. Del. 2011).

160.     Further, where a defendant is served pursuant to a nationwide service of process provision (such as those set forth in ERISA), the minimum contacts requirement is satisfied for federal constitutional purposes so long as the defendant has sufficient minimum contacts with the United States as a whole. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 369 (3d Cir. 2002).

161.     Here, all of the Defendants other than Laguna will be served in the United States, and they all have sufficient contacts with the United States as a whole, including because they are incorporated/organized under the laws of Delaware, Texas, Colorado, or Nebraska.

162.     As such, when the Defendants other than Laguna are served, this Court will have personal jurisdiction over those Defendants.

163.     In addition, this Court has personal jurisdiction over Defendants Farmland Dairies, Promised Land Dairy, and New Laguna for the independently sufficient reason that they are organized under the laws of Delaware. (See paragraphs 10, 11, and 13 above.)

## **CLAIM FOR RELIEF**

164.     Plaintiffs hereby reallege and incorporate each and every allegation made in paragraphs 1 through 163 of this Complaint as though fully set forth herein.

165.    The Borden Controlled Group did not timely initiate arbitration pursuant to 29 U.S.C. § 1401(a)(1). Consequently, the withdrawal liability amounts demanded by Central States are "due and owing" pursuant to 29 U.S.C. § 1401(b)(1).

166.    Further, because no withdrawal liability payments were made within 60 days of when the Past Due Notices were received, the Borden Controlled Group has fallen into default within the meaning of 29 U.S.C. § 1399(c)(5).

167.    Defendants Laguna, Lala Branded Products, Gilsa Real Estate, Farmland Dairies, Promised Land Dairy, and Sinton Dairy, as members of the Borden Controlled Group, are jointly and severally liable for the Central States Withdrawal Liability.

168.    Further, as the alter ego of Defendant Laguna, Defendant New Laguna is jointly and severally liable for all liabilities of Laguna, including the Central States Withdrawal Liability.

**WHEREFORE**, Plaintiffs request the following relief:

(a)    A judgment against Defendants, and on behalf of Plaintiffs, pursuant to 29 U.S.C. §§ 1132(g)(2) and 1451(b), for --

(i)    $39,319,944.00 in withdrawal liability principal;

(ii)   interest computed and charged at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA for the fifteenth (15th) day of the month for which interest is charged;

(iii)  an amount equal to the greater of interest on the unpaid withdrawal liability or liquidated damages of 20% of the unpaid withdrawal liability; and

(iv)   attorney's fees and costs.

(b)     Post-judgment interest computed and charged on the entire judgment at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA for the fifteenth (15th) day of the month for which interest is charged, compounded annually; and

(c)     Such further or different relief as this Court may deem proper and just.

Date:   August 30, 2022

SULLIVAN · HAZELTINE · ALLINSON LLC

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
E-mail: bsullivan@sha-llc.com

and

Andrew J. Herink (#6303510)
Central States Law Department
9377 W. Higgins Road, 10th Floor
Rosemont, Illinois 60018
Telephone: (847) 939-2458
Fax: (847) 518-9797
aherink@centralstatesfunds.org

*Counsel to Central States, Southeast and Southwest Areas Pension Fund; and Charles A. Whobrey, as Trustee*
